

**FILED**
**Nov 17, 2020**
**01:48 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT JACKSON

| | | |
|---|---|---|
| **JOE ERWIN,** | ) | **Docket No. 2018-07-0065** |
| **Employee,** | ) | |
| **v.** | ) | |
| **BT REDI MIX, INC.,** | ) | **State File No. 7429-2018** |
| **Employer,** | ) | |
| **And** | ) | |
| **ERIE INS. CO.,** | ) | **Judge Allen Phillips** |
| **Carrier.** | ) | |

## COMPENSATION ORDER DENYING BENEFITS

This case came before the Court for a Compensation Hearing on October 21, 2020. Mr. Erwin requested benefits for an injury to his right eye. BT Redi-Mix contended the injury did not arise out of his employment. The Court agrees with BT and denies his claim.

### History of Claim

Mr. Erwin's injury is a detached retina in his right eye, the presence of which is undisputed; however, its relation to Mr. Erwin's employment at BT is highly disputed. Specifically, the parties contest whether the detachment occurred when Mr. Erwin was struck by a co-worker during an altercation.

The Court first considered the dispute at an Expedited Hearing. Evidence produced there provides a contextual background.

Namely, Mr. Erwin, a former cement truck driver for BT, then attributed his detached retina to an incident on June 7, 2017, when another driver, Ray Boyd, punched him directly in the right eye. He said his eye turned "black, blue, and bloody," though he later said he did not "look in the mirror." Nevertheless, he said by the next day he "couldn't see" out of the eye. Conversely, BT offered the testimony of Mr. Erwin's former supervisor, David Lovelace, who was "100% certain" he saw Mr. Boyd slap Mr. Erwin's

1

*left* cheek, leaving a red mark. BT also offered the signed declaration of co-employee Brando Shaw, who saw Mr. Boyd strike Mr. Erwin's left cheek with a "right-handed smack."

Medical records revealed Mr. Erwin's first evaluation did not occur until November 13, when he saw Dr. Lewis Kizer. He told Dr. Kizer that his right eye "went black" in *March* after getting cement in it. He also said he "was hit in [the] same eye by a guy with the palm of his hand" but did not say when. Dr. Kizer diagnosed the detached retina and referred him to Dr. Sunny Khamapirad, a retina specialist.[1] On November 22, Mr. Erwin told Dr. Sunny that he was "hit with powdered cement in *May* 2017" and then was "punched" in the eye, presumably in May as well.[2] Then, BT provided Mr. Erwin a panel of ophthalmologists from which he chose Dr. Adam Luka, who on March 30, 2018, said the retinal detachment was "presumably secondary" to trauma at work and of "8 months duration."

The Court ruled against Mr. Erwin at the Expedited Hearing, finding his credibility suspect. Specifically, the Court found Mr. Erwin testified his co-employee struck him directly in the right eye, while two eyewitnesses swore the co-employee slapped him on the left cheek. Mr. Erwin claimed the appearance of a black, blue and bloody eye but then said, "somewhat incredulously, that he 'did not look in the mirror.'" Mr. Erwin also said he "loses track of years," a statement that appeared both "flippant and incredible," given that the question centered on when his blindness began.

Further, the Court found that, "Mr. Erwin's problem [was] not that he is a poor historian" but, instead his questionable histories prevented the Court from finding a causal connection between his injury and his work. Thus, the Court held Mr. Erwin was unlikely to prevail at a hearing on the merits and denied his claim.

After engaging in discovery and taking medical proof, the parties proceeded to the Compensation Hearing, where Mr. Erwin and several other witnesses testified

Mr. Erwin's wife testified she recalled her husband getting cement in his eye but, rather than losing his vision then like he told Dr. Kizer, she said it improved with no problems. Then, on the date of the altercation, she observed Mr. Erwin's right eye was "black clear down past his nose," swollen, and looked like it was bleeding. She said it was "easily visible" and "lasted for about two weeks." She urged him to see a physician.

Roy Alexander, a former driver at BT, testified the altercation between Mr. Erwin and Mr. Boyd occurred after Mr. Erwin asked BT for a pay raise for the drivers without

---

[1] The parties and other physicians referred to Dr. Khamapirad as "Dr. Sunny," and the Court will do the same.

[2] Both parties argued Mr. Erwin provided a history to Dr. Sunny of being struck in the right eye in May; the Court found the handwritten note difficult to read but adopts the parties' interpretation of it.

their consent. By his direct observation, he saw Mr. Boyd "slap" Mr. Erwin, leaving a handprint on his face, first saying the right side but then clarifying it was on the left side because Mr. Boyd led with his right hand while facing Mr. Erwin.

Chris Maness, who still drives for BT, saw Mr. Boyd hit Mr. Erwin, striking him with such force that his "head went back." But he did not remember which side of Mr. Erwin's face Mr. Boyd struck and specifically added that he was not "trying to defend or hurt [Mr. Erwin] in any way." Another driver, Tony Garmin, did not see the altercation but noted the dispute over the pay raise led to it and that he did not ask Mr. Erwin to ask for the raise.

Mr. Lovelace again testified. He said Mr. Erwin had an out-of-state commercial driver's license when BT hired him, and that Mr. Erwin told him then that he could not pass an eye examination to obtain a Tennessee license. He also recalled when Mr. Erwin got cement in his eye but said he did not complain of losing vision at that time.

Regarding the altercation, Mr. Lovelace said Mr. Erwin first argued with Brando Shaw regarding the pay raise request; Mr. Lovelace "broke up" that argument. Mr. Lovelace said Mr. Erwin then walked away, and Mr. Boyd approached and "came around" to face him. Mr. Lovelace was "100% positive" that Mr. Boyd then slapped Mr. Erwin's left cheek with his right hand, asserting on cross-examination that it was not merely his opinion but "what I saw." Further, just as he testified at the Expedited Hearing, he again said he saw a red mark on Mr. Erwin's left cheek. Mr. Lovelace also testified Mr. Erwin did not tell him that he lost his vision until November, and but then he attributed it to getting cement in his eye.

Brando Shaw agreed he argued with Mr. Erwin over the pay raise request, asserting that he never asked Mr. Erwin to ask for it. He said that when Mr. Erwin left the office after asking for the raise, Mr. Erwin was "cussing and hollering" as if he were "drunk." Mr. Erwin commenced the argument with him, and Mr. Lovelace separated them. Mr. Shaw then saw Mr. Erwin walk behind Mr. Boyd, continuing to loudly curse. At that point, Mr. Boyd turned to face Mr. Erwin and "smacked" him on the left cheek with his right hand. He said Mr. Boyd did not strike Mr. Erwin from behind.

For his part, Mr. Erwin testified that he "probably completed" the tenth grade and that he worked at BT on different occasions, the last time beginning in 2015 or 2016, or "something like that." He related that he got cement in his right eye in March 2017 but that, after washing it out, had no further problems. He also said he had gotten smoke in his *left* eye in March, and it took him "six weeks to get the smoke out."

Mr. Erwin confirmed that he first argued with Mr. Shaw, admitting he threatened to "break him in half." He also said the disputes with his fellow drivers stemmed from his asking for a pay raise. When confronted with Mr. Garmin's testimony that he did not ask

Mr. Erwin to request a raise, Mr. Erwin said he "wasn't really listening" to Mr. Garmin's trial testimony, but then tried to clarify by saying, "I probably heard him say something like that."

As to the altercation at issue, Mr. Erwin could not remember the date. However, he and his attorney demonstrated how they contend Mr. Boyd struck Mr. Erwin. Specifically, counsel played the role of Mr. Boyd by approaching Mr. Erwin from behind and to his right. He then demonstrated a motion of swinging his hand around Mr. Erwin's right shoulder or arm and striking his right eye. Mr. Erwin said he never saw Mr. Boyd "come at him" and described that his head "went back and to the left" after being hit. He said Mr. Boyd struck him with either his fist or his palm. On cross-examination, Mr. Erwin contended that he had never said he was punched, but only said he was "hit." He maintained that he had no loss of vision until after Mr. Boyd struck him.

When confronted with his Expedited Hearing testimony that his eye turned black, blue and bloody, Mr. Erwin again testified that he "never looked at" his right eye after the incident, saying he "did not want to." However, he also said that he saw his eye was "red" or "bloodshot," conceding that he might have "glanced at it one time." Also, he said he looked in the mirror when shaving.

For medical proof, Mr. Erwin offered the testimony of ophthalmologist Dr. James Freeman, who recorded a history that Mr. Erwin was hit in the right eye with a fist "around July of 2017" and lost vision afterward. Based on that history, Dr. Freeman said the blow to Mr. Erwin's eye was "more likely than not the injury that precipitated the [detachment]."

Conversely, BT offered the testimony of ophthalmologist Dr. David Harris, who did not believe that a slap to the left cheek would cause a detached retina. Further, because Mr. Erwin had preexisting degenerative conditions in both eyes, Dr. Harris stated to a reasonable degree of medical certainty that the detachment was unrelated to any blow sustained by Mr. Erwin.

Based on this evidence, Mr. Erwin argued that he was "very confident" that he lost his vision after he was struck and that the "uncontroverted testimony" was that he lost vision after he was struck. He called himself a "horrible historian," but contended that medical records are not "fool-proof." Nevertheless, he contended that Dr. Freeman's opinion was "determinative" as to causation. Finally, he considered Mr. Alexander, the former BT driver, most credible because he no longer works there, whereas the other witnesses do and therefore have incentive to support BT's position. BT maintained Mr. Erwin did not establish a compensable injury.

**Findings of Fact and Conclusions of Law**

At a Compensation Hearing, Mr. Erwin must establish all elements of his claim by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6) (2019).

The dispositive issue remains whether Mr. Erwin's injury arose primarily out of his employment at BT. *See generally* Tenn. Code Ann. § 50-6-114. As at the previous hearing, the case still turns on credibility. On that point, the Court finds Mr. Erwin's claim is plagued by the same ills as at his Expedited Hearing. Namely, his questionable credibility and inconsistent histories prevent a finding that his detached retina arose primarily out of his employment.

First, the Court finds Mr. Erwin's credibility was suspect from the outset of the hearing. He said he "probably completed" the tenth grade and that he began his last period of employment stint at BT in 2015 or 2016, or "something like that." He could not recall the date of the incident, although he claimed it blinded his right eye.

Second, his description of the altercation conflicts with the eyewitnesses' description. He and counsel demonstrated a blow from behind, but Mr. Alexander, Mr. Lovelace, and Mr. Shaw saw a blow from the front. They also described a "slap" to the left cheek, not a punch in the right eye. Mr. Erwin himself equivocated on whether he was punched, testifying that he "never" said he was punched but rather "hit," a statement at odds with his previous testimony and histories to the physicians.

Third, Mr. Erwin's assertion he looked at his eye only once after being struck is too unbelievable to ascribe it any credibility. Notably, he admitted to looking in the mirror while shaving. Further, even if he looked at his eye only once, he said it looked red or bloodshot, not black, blue or bloody, contradicting his testimony at the Expedited Hearing. This also flies in the face of his wife allegedly seeing a massive black eye extending down the right side of his face.

Finally, the Court again considers Mr. Erwin's inconsistent medical histories. He first told Dr. Kizer that his vision went black in March after getting cement in it. He then told Dr. Sunny that he got cement in his eye in May and was hit then, not in June. The inconsistencies continued with what he told Dr. Freeman, his own evaluating physician, when he said he was hit in the right eye with a *fist* "around *July*." His testimony at the Compensation Hearing was that he was not sure if he was hit with a fist or if he was even punched.

Taken in its totality, the Court finds the evidence preponderates against Mr. Erwin. His description of the altercation was contrary to the eyewitnesses, his histories to the physicians were inconsistent, and his testimony that he did not look at his eye were

unbelievable. Thus, the Court cannot credit Mr. Erwin's testimony and denies his request for benefits.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Erwin's claim is denied, and the case dismissed with prejudice.

2. BT shall pay $150 costs to the Court Clerk within five business days under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (August, 2019).

3. BT shall prepare and submit to the Court Clerk a Statistical Data Form (SD2) within ten business days of this order becoming final.

4. Unless appealed, this order shall become final thirty days after issuance.

**ENTERED November 17, 2020.**


_____*Allen Phillips*_____
**JUDGE ALLEN PHILLIPS**
**Court of Workers' Compensation Claims**


## APPENDIX

Technical record:
1. Expedited Hearing Order with attached technical record
2. Scheduling Order
3. Post-Discovery DCN
4. Joint Pre-Compensation Hearing Statement
5. Employer's Trial Brief
6. Order of Continuance
7. Motion to Wear Face Shields
8. Order Allowing Face Shields

Exhibits:
1. Collective Medical records of Drs. Kizer, Khamapirad, Luka and David Harris IME
2. First Report of Work Injury
3. Panel of Physicians
4. Dr. David Harris Deposition with complete exhibits filed by employer on July 29, 2020
5. Dr. James Freeman Deposition

## CERTIFICATE OF SERVICE

I certify that a copy of this Compensation Order was sent as indicated on November 17, 2020.

| Name | Via Mail | Via Email | Service Sent To: |
|------|----------|-----------|------------------|
| Charles L. Holliday, Employee's Attorney | | X | chuckh@garretylaw.com masher@garretylaw.com |
| Seth Granda and Catherine Dugan, Employer's Attorneys | | X | seth@petersonwhite.com cate@petersonwhite.com |

_Penny Shrum_
**Penny Shrum, Court Clerk**
**Wc.courtclerk@tn.gov**



Compensation Hearing Order Right to Appeal:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fullycompleted Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____ **Employer**

Notice is given that _____ *[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date filestamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____ issued

by Judge _____.

**Statement of the Issues on Appeal**

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

**Parties**

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### <u>CERTIFICATE OF SERVICE</u>

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*__ [Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning _____ |
| SSI | $ _____ per month | beginning _____ |
| Retirement | $ _____ per month | beginning _____ |
| Disability | $ _____ per month | beginning _____ |
| Unemployment | $ _____ per month | beginning _____ |
| Worker's Comp. | $ _____ per month | beginning _____ |
| Other | $ _____ per month | beginning _____ |

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental $ _____ per month

Groceries    $ _____ per month    Telephone    $ _____ per month

Electricity    $ _____ per month    School Supplies $ _____ per month

Water    $ _____ per month    Clothing    $ _____ per month

Gas    $ _____ per month    Child Care    $ _____ per month

Transportation $ _____ per month    Child Support    $ _____ per month

Car    $_____ per month

Other    $ _____ per month (describe: _____ )

10. Assets:

Automobile    $ _____    (FMV) _____

Checking/Savings Acct. $ _____

House    $ _____    (FMV) _____

Other    $ _____    Describe:_____

11. My debts are:

| Amount Owed | To Whom |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)                             RDA 11082